956 F.2d 1164
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James D. MCDERMOTT, Plaintiff-Appellant.
v.
PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Defendant-Appellee.
 No. 91-3640.
 United States Court of Appeals, Sixth Circuit.
 March 11, 1992.
 
 Before KENNEDY and NATHANIEL R. JONES, Circuit Judges; and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, James D. McDermott, appeals the district court's order entering summary judgment in favor of his former employer, Provident Life and Accident Insurance Company, in this action alleging discharge from employment on the basis of age in violation of state and federal law. For the reasons that follow, we affirm the judgment below.
 
 
 2
 * Provident is a Tennessee corporation with its principal office in Chattanooga, Tennessee. Provident's main function is to support the sale and servicing of insurance policies through its various branch offices. McDermott was manager of Provident's Cincinnati branch from 1964 until his discharge on March 13, 1989, at age fifty-eight. McDermott's principal responsibility was to develop sales of Provident insurance policies, primarily through independent insurance brokers. McDermott was also responsible for all aspects of the branch office's operations, including the hiring and firing of employees and the negotiation of office leases. During much of McDermott's tenure, he received positive performance marks on company evaluations. The Cincinnati branch, like most others, employed consultants who assisted in developing sales.
 
 
 3
 During the relevant period, John Barnes was Vice President and Chief Operating Officer of the Accident Department, and Ralph Christiani was the Accident Department's Chief Marketing Officer. Christiani reported directly to Barnes and was responsible for branch operations, which he oversaw through various regional directors. In 1987, Robert Fowler, age twenty-eight, replaced the previous regional director to become McDermott's immediate superior.
 
 
 4
 In late 1986 and 1987, the Cincinnati branch experienced a reduction in the number of consultants, leaving McDermott with only one consultant to assist him. Although Christiani assured McDermott that he would receive additional consultants, the promised help never materialized. Thus, while cities such as Milwaukee, Cleveland, Pittsburgh, and Saint Louis had at least two consultants in their branch offices, McDermott was left with only one. In 1987, McDermott missed his quota for paid business by somewhat less than 10%, although he exceeded his quota in terms of submitted business.[1]
 
 
 5
 In 1988, after McDermott's final consultant resigned, McDermott's quota was reduced from $950,000 to $750,000. Nevertheless, McDermott missed his quota again in 1988. In January of 1989, Fowler and Christiani went to Cincinnati to discuss with McDermott his production problems and the possibility of early retirement. After McDermott refused to take early retirement, he was placed on a probationary quota of $675,000 in paid business for 1989. Provident demanded that McDermott produce the first half of this amount in the first six months of the year even though the majority of business is normally not paid until the second half of the year. To assist him in achieving the probationary quota, McDermott requested, but was denied, a promotional "blitz" tried earlier in Saint Louis.
 
 
 6
 On March 9, 1989, McDermott was called to Chattanooga to discuss with Barnes three violations of company policies that Provident suspected McDermott had committed: (1) that McDermott had purchased the office building housing the Cincinnati branch office, thus becoming Provident's landlord, and had intentionally kept the ownership secret from the company despite the apparent conflict of interest; (2) that he had directly sold insurance policies, signed his wife's name to the policies, and falsely represented that his wife had made the sales, all in violation of company policy; and (3) that he had hired his son-in-law at the Cincinnati office in violation of Provident's anti-nepotism policy. McDermott substantially admitted having committed all three violations. Two days after this meeting, Provident fired McDermott, citing his violations of company policy and recent poor performance as the grounds for his termination.
 
 
 7
 On October 10, 1989, McDermott filed a complaint in the United States District Court for the Southern District of Ohio against Provident alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-34 (West 1985 & Supp.1991), as well as Ohio Rev.Code Ann. §§ 4112.02, .99 (Baldwin 1990). On March 20, 1991, the district court granted Provident's motion for summary judgment. The court reasoned that McDermott's admitted violations of company policy rendered him unqualified for the position of branch manager, thus precluding McDermott from establishing a prima facie case of employment discrimination. The court also found no evidence, other than McDermott's "conclusory allegations," that Provident's articulated reasons for the termination were pretexts for an underlying age-discriminatory motive. J.A. at 107. The court found McDermott's state law claims equally without merit. This timely appeal followed.
 
 II
 
 8
 "Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law." Curry v. Vanguard Ins. Co., 923 F.2d 484, 485 (6th Cir.1991). On a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Although our review is plenary, it rests in part on the underlying substantive dispute, as "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." Id.
 
 
 9
 Under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), the plaintiff in an employment discrimination action bears the initial burden of establishing a prima facie case.[2] As a general matter, a plaintiff may establish a prima facie case under the ADEA by showing that "(1) he was a member of the protected class, (2) he received adverse employment action, (3) he was qualified, and (4) he was replaced by a younger person." Moody v. Pepsi-Cola Metro. Bottling Co., 915 F.2d 201, 208 (6th Cir.1990). A prima facie case raises a presumption of discrimination and shifts the burden to the defendant to articulate "some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. The employer's burden at this stage is light; it need only offer evidence sufficient to create a genuine issue of fact as to whether it discriminated against the plaintiff. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). When the defendant meets its burden, the presumption established by the prima facie case disappears, leaving the plaintiff with the task of proving that the defendant's proffered reason is a pretext for discrimination, which merges with the plaintiff's ultimate burden of persuasion. Burdine, 450 U.S. at 256; Moody, 915 F.2d at 208.
 
 
 10
 In the context of discriminatory discharge actions, the issue of qualification may be rephrased as whether the employee " 'was doing his job well enough to meet his employer's legitimate expectations.' " Chappell v. GTE Prods. Corp., 803 F.2d 261, 266 (6th Cir.1986) (quoting La Montagne v. American Convenience Prods., Inc., 750 F.2d 1405, 1409 (7th Cir.1984)), cert. denied, 480 U.S. 919 (1987). The "legitimate expectations" analysis, in turn, seeks to reflect the fundamental issue of whether the plaintiff would have been retained in the absence of the alleged unlawful bias. See Danielson v. City of Lorain, 938 F.2d 681, 684 n. 1 (6th Cir.1991).
 
 
 11
 In finding that McDermott's violations of company policy precluded him from establishing a prima facie case, the district court relied on McDonald v. Union Camp Corp., 898 F.2d 1155 (6th Cir.1990). In McDonald, the employer alleged that, despite McDonald's consistently strong performance, his termination was justified due to his inability to get along with co-workers. Id. at 1158. In upholding summary judgment for the employer, we stated as follows:
 
 
 12
 McDonald does not dispute, but in fact acknowledges that his supervisors were dissatisfied with his job performance ... when he was discharged. Instead McDonald argues that Union Camp made too big a deal out of his alleged "people problems." However, the aim is not to review bad business decisions, or question the soundness of an employer's judgment. McDonald was simply not performing to Union Camp's satisfaction. Since McDonald concedes this point, there remains no genuine issue of material fact as to whether he was qualified.
 
 
 13
 Id. at 1160 (citation omitted); see also Ang v. Procter & Gamble Co., 932 F.2d 540, 548-49 (6th Cir.1991).
 
 
 14
 In the present appeal, Provident rests its claim that McDermott was unqualified on the fact that McDermott admitted having violated company policies. Provident argues that because McDermott is unable to prove he was qualified, and thus unable to establish a prima facie case, there is no need for this court to inquire whether Provident's proffered reason for McDermott's discharge was pretextual. This court, however, has consistently advised against a strict adherence to the McDonnell Douglas structure in cases arising under the ADEA, particularly where its rigid application might result in injustice to either party. See LaGrant v. Gulf & W. Mfg. Co., 748 F.2d 1087, 1090 (6th Cir.1984); Blackwell v. Sun Elec. Corp., 696 F.2d 1176, 1179 (6th Cir.1983); Laugesen v. Anaconda Co., 510 F.2d 307, 312 (6th Cir.1975). Rather, this court has admonished that, "[i]nstead of a mechanistic application of the McDonnell Douglas guidelines, a trial judge is to consider 'direct evidence of discrimination, and circumstantial evidence other than that which is used in the McDonnell Douglas criteria.' " Wanger v. G.A. Gray Co., 872 F.2d 142, 144-45 (6th Cir.1989) (quoting Blackwell, 696 F.2d at 1180).
 
 
 15
 We believe that strict adherence to the McDonnell Douglas format is particularly inappropriate under the circumstances presented here. In many cases, whether the employee was qualified and whether the employer had a legitimate, nondiscriminatory reason to terminate the employee will present two distinct inquiries. For example, where an employer reduces its workforce due to economic constraints or as a result of corporate reorganization, the decision to fire an employee may be only marginally related, if at all, to the employee's ability to perform her job. In such cases, it is both just and efficient to require the employee to establish that she was qualified before placing upon the employer the burden of articulating a nondiscriminatory reason for its actions. The employer is thereby relieved from defending patently unmeritorious claims, while the employee is left the opportunity to show both that she was qualified and, if necessary, that the reasons offered for her termination are merely pretextual or are unworthy of credence.
 
 
 16
 In other cases, however, the issues of an employee's qualifications and of the employer's proffered reason for the termination may blend into one. This may occur, for instance, where the employer claims that the employee was fired due to her failure satisfactorily to perform her job. In such cases, the employer's grounds for the termination may frustrate an employee's ability to satisfy the "qualification" prong of the prima facie case test. Because the question of pretext, however, normally arises only after an employee has established a prima facie case, rigid adherence to the evidentiary scheme of McDonnell Douglas might effectively deny the employee an opportunity to prove that the proffered grounds for her termination were pretext. We find such an approach ill-advised. See, e.g., Wilkins v. Eaton Corp., 790 F.2d 515, 522 (6th Cir.1986) ("The dispositive motivational issue requires a consideration of the two opposing reasons for discharge.... The burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff.").
 
 
 17
 This court has often concluded that an employee failed below to establish a prima facie case of discrimination, yet we still proceeded to consider whether the employee's allegations of pretext had merit. For instance, in Gagne v. Northwestern National Insurance Co., 881 F.2d 309 (6th Cir.1989), the employer, in response to an employee's attempt to establish a prima facie case of age discrimination, offered evidence showing that the employee was terminated because she was not qualified for her position. Id. at 313. This court nevertheless proceeded to review whether the employee could prevail on her claim that the proffered reason for her termination was pretextual. Id. at 313-14, 316; accord Ang, 932 F.2d at 548-50 (finding that employee failed to establish "qualification" prong of prima facie case yet proceeding to review claim that the proffered reason for termination was pretextual); McDonald, 898 F.2d at 1160, 1162 (same). Notably, the district court in the instant case adopted this approach as well; while it concluded that McDermott failed to establish a prima facie case, it proceeded to review McDermott's pretext claim. We believe that the district court acted correctly, and will therefore review McDermott's claim that his violations of company policy were merely a pretext for Provident's true motives.
 
 
 18
 A plaintiff may show that an employer's stated grounds for the termination are pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. This court has noted three ways in which a plaintiff may rebut the employer's proffered reasons for termination: "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the discharge, or (3) if they were factors, by showing that they were jointly insufficient to motivate the discharge." Chappell, 803 F.2d at 266. The plaintiff may rely on circumstantial evidence such as differential treatment, inconsistent records, or statistical evidence in order to establish an inference of discrimination. Id. The burden, however, remains with the plaintiff to establish that, "but for" the discriminatory motive, he would not have been terminated. Id. at 265.
 
 
 19
 Upon review, we conclude that McDermott has not come forth with sufficient evidence to raise a genuine issue of fact that age was a motivating factor in his termination. McDermott relies principally upon the affidavit testimony of Paul Brawner, a former branch manager of Provident's Orlando, Florida office. Brawner testified that Provident urged him to retire at age sixty-five, drastically increased his production quotas in the two years preceding his termination, and refused to provide additional consultant help unless he agreed to retire. Brawner, however, never alleged that Provident's actions were motivated by an age-discriminatory animus, nor does he aver that he was treated differently than other similarly situated, younger branch managers.
 
 
 20
 McDermott also relies on exhibits relating to Bill Bauman, age sixty, who was branch manager of the Minneapolis office. Although Bauman alleged that he felt he was being "forced" to retire, J.A. at 161, in a letter to Bauman dated August 18, 1988, Fowler stated that "I totally agree with your statement that your age is not a deterrent to your productivity or your enthusiasm to be a good Branch Manager," id. at 155, and that it was Fowler's "intention to continue to work with you and get Minneapolis on track to its production capability," id. McDermott offers no grounds for believing that Fowler's representations were not made in good faith, nor is there any indication that Provident treated Bauman differently than similarly situated younger managers.
 
 
 21
 McDermott claims to have uncovered evidence of differential treatment in a letter written by Provident to Greg Freeman, a young branch manager. However, this letter, if anything, supports Provident's position. Like McDermott, Freeman was refused new consultants despite the fact that he was experiencing consultant losses, and he was placed on a production schedule substantially identical to the one imposed on McDermott. Similarly unpersuasive is McDermott's contention that he was denied advertising assistance that was offered to younger branch managers. Provident offered unrebutted testimony that the advertising assistance McDermott sought had been attempted only once before and was found to be unsuccessful.
 
 
 22
 The remainder of McDermott's evidence is substantially less persuasive. McDermott makes much of a comment by Fowler at a meeting of branch managers and consultants in 1987 that "our commitment is to you, to young guys, the consultants. Our future lies with you." J.A. at 370. This court has consistently held, however, that such isolated, ambiguous statements " 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.' " Gagne, 881 F.2d at 314 (quoting Chappell, 803 F.2d at 268 n. 2)).
 
 
 23
 McDermott's reliance on the testimony of consultant William Storey is equally unavailing. While Storey did suggest a certain animosity between Fowler and McDermott, Storey also stated that, "[b]ased upon my discussions with Provident personnel, including Fowler, and based upon my observations, I did not interpret any company action or statement concerning McDermott to be age related, nor did I observe or hear anything to suggest that McDermott was treated differently by Provident because of his age." J.A. at 224. The fact that Fowler may have harbored some personal animus against McDermott, however, does not support an ADEA claim absent evidence that this animus was age based. See Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 70 (6th Cir.1982) ("Personality conflicts alone cannot supply a basis for an ADEA claim.").
 
 
 24
 McDermott also seeks to raise an inference of discrimination through evidence suggesting that Provident had known of his violations of company policy in July, 1988, but did not use them as a basis for termination until March, 1989. Provident offered unrebutted testimony, however, that while it suspected McDermott of certain violations in July, 1988, it required the intervening time to investigate the charges, and in fact was not convinced of the violations until McDermott admitted to them at the March, 1989 meeting. Moreover, McDermott fails to indicate why Provident's delay of seven months is evidence of pretext rather than simple prudence.
 
 
 25
 Finally, while McDermott testified that other branch managers violated company policies but were never reprimanded or terminated, he failed to offer any evidence that Provident knew of these violations. Thus, there is no evidence from which to infer that McDermott was treated differently than other branch managers whom Provident suspected of violating company policies.
 
 III
 
 26
 In light of the foregoing, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 "Paid" business refers to those accounts on which the insurance premiums have been collected, while "submitted" business refers only to accounts on which premiums are expected
 
 
 [2]
 The Ohio Supreme Court has held that claims brought under Ohio Rev.Code Ann. 4112.02, upon which McDermott rests his state law claim, shall be analyzed identically to federal claims brought under the ADEA. See Barker v. Scovill, Inc., Schrader Bellows Div., 451 N.E.2d 807, 809 (Ohio 1983). Thus, our analysis of McDermott's federal claim applies to his state law claim as well